IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| MOHAMED FALL, | : | Case No. 1:15-cv-00127 |
| Plaintiff, | : | Judge Susan J. Dlott |
| v. | : | |
| LA FITNESS, *et al.*, | : | **ORDER GRANTING DEFENDANTS'** |
| | : | **MOTION FOR SUMMARY** |
| Defendants. | : | **JUDGMENT** |

This matter is before the Court on Defendants' Motion for Summary Judgment (Doc. 44). Plaintiff has filed a memorandum in opposition (Doc. 49), to which Defendants have replied (Doc. 51). Oral argument was held in Chambers on February 8, 2016. For the reasons that follow, Defendants' motion will be GRANTED.

**I.     BACKGROUND**

**A.  Facts[1]**

On October 21, 2013, Plaintiff Mohamed Fall purchased a membership for the LA Fitness facility located at 4700 Marburg Avenue in the Oakley neighborhood of Cincinnati, Ohio. (Bayer Aff., Doc. 11 at ¶ 5 (at PageID 60) & Exh. A (at PageID 63-66).) The services and amenities available at the Oakley club include a basketball gym, elliptical trainers, free weights, racquetball courts, a spinning room, boxing equipment, a swimming pool, locker rooms, personal trainers, yoga, and aerobics. Plaintiff has used the basketball court, exercise machines, free weights, racquetball courts, boxing equipment, swimming pool, and men's locker room, and has

---

[1] Except as otherwise indicated, background facts are drawn from Defendants' Proposed Undisputed Facts (Doc. 44-1 at PageID 685–90) to the extent those facts are admitted in Plaintiff's response thereto (Doc. 49-2 at PageID 915–22). Where the parties do not expressly agree, the Court cites to that portion of the record providing support for the statement.

1

participated in yoga classes. The other services and amenities available do not interest him. On average, Plaintiff visits the Oakley club six times per week, sometimes seven. Since joining, he has exercised there "on well over 300 occasions." (Second Amended Complaint, Doc. 33 at ¶ 10 (at PageID 186).)

Mr. Fall was born in Senegal. (Fall Aff., Doc. 3-1 at ¶ 3 (at PageID 28).) As a child, he immigrated to the United States as a refugee from Mauritania. (*Id.*) Mr. Fall is a practicing Muslim. (*Id.* at ¶ 9 (at PageID 29).) After completing his exercise at the Oakley club, he conducts Salat, or prayer, for his "physical, mental, emotional, psychological and spiritual benefit." (*Id.* at ¶ 11 (at PageID 29).) He prays facing the wall, standing and kneeling at different times during the prayer. (Fall Dep., Doc. 38 at 90:20–91:6.) He does not use a prayer mat. (Fall Aff., Doc. 3-1 at ¶ 12 (at PageID 29).) His prayer is essentially silent and typically lasts between five and seven minutes. (*Id.* at ¶ 12 (at PageID 29), Fall Dep., Doc. 38 at 77:4-6.) He remains dressed in his workout clothes while praying. (Fall Aff., Doc. 3-1 at ¶ 12 (at PageID 29).) According to Mr. Fall's understanding of his Muslim faith, there are no criteria that delineate a "proper" prayer location. Rather, in his words, to be observant, one simply needs to pray, and he "pretty much pray[s] wherever [he] feel[s] comfortable." (Fall Dep., Doc. 38 at 63:14-15.)

The incident about which Plaintiff complains occurred on January 29, 2015. On that evening, three staff members asked him "not to pray" in a particular location in the men's locker room. (*Id.* at 38:22-24.) That location is to the left as one enters the locker room, near the entrance and also near the coat rack, fire extinguisher, and lockers. (*Id.* at 42:13–43:2.) Plaintiff described their interaction as follows:

> I was praying. I came in that evening. From work. Went into the gym.
> Worked out and went in there to pray. As I was praying, those three guys

> came behind my back in the middle of my pray (sic) and stood up there and watched me for a second. It made me uncomfortable and I stopped in the middle of my pray and I turned back [and] they told me I can't pray there anymore.

(*Id.* at 40:16-23.) In response, Plaintiff gathered his belongings and left. (*Id.* at 54:16.) He testified, "I felt horrible. I felt bad like I was doing something wrong." (*Id.* at 53:22-23.)

### B. Procedural Posture

On February 23, 2015, Plaintiff initiated this civil suit by filing a Motion for Temporary Restraining Order and Preliminary Injunction (Docs. 1–4) as well as a Complaint (Doc. 5). In his Complaint, Plaintiff alleged a violation of Title II, 42 U.S.C. § 2000a and sought compensatory and punitive damages in addition to injunctive relief. (Doc. 5 at PageID 23–24.) Thereafter, the Court conferred with the parties by telephone on February 24, 2015 and February 27, 2015, and, on March 4, 2015, met the parties at the Oakley club for purposes of touring the facility. While on-site, the Court orally denied Plaintiff's Motion.

Plaintiff amended his Complaint once as a matter of course. (*See* Docs. 20–22.) His First Amended Complaint likewise sought compensatory and punitive damages in addition to injunctive relief as remedy. (Doc. 22 at PageID 134.) Defendants moved for partial summary judgment, arguing that monetary damages are not recoverable in an action brought under Title II. This Court agreed, citing *Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 401–402 (1968) ("When a plaintiff brings an action under [Title II], he cannot recover damages.") and *Watson v. Fraternal Order of Eagles*, 915 F.2d 235, 241 (6th Cir. 1990) ("Title II only permits the issuance of an injunction and declaratory relief."). (Doc. 29 at PageID 163.) Plaintiff was advised, however, that if—after conducting discovery—he decided to pursue additional claims for which money damages were recoverable, the Court would entertain a motion for leave to file a second amended complaint. (*Id.*)

3

On September 1, 2015, the Court granted leave to Plaintiff (*see* Doc. 32) to file a Second Amended Complaint. In it, he asserts three causes of action: a violation of Title II, 42 U.S.C. § 2000a-2, for which he seeks a declaratory judgment and a permanent injunction; a violation of Ohio Rev. Code § 4110.02(G), (I), and (J), for which he seeks compensatory and punitive damages in addition to injunctive relief; and the common law tort of negligent training and supervision, for which he seeks money damages. (Doc. 33 at PageID 197–98.) Plaintiff names as Defendants LA Fitness and Fitness International, L.L.C. He also names the three LA Fitness employees who asked him "not to pray" on January 29, Jaymes Jameel Thomas, Zach Kemker, and Chad O'Reilly, as well as the Oakley club's General Manager, Eric Bayer. (*See id.* at PageID 184.)

## II. STANDARD OF LAW

Although a grant of summary judgment is not a substitute for trial, it is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The process of evaluating a motion for summary judgment and the respective burdens it imposes upon the movant and the non-movant are well-settled. First, "a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact[.]" *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see LaPointe v. United Autoworkers Local 600*, 8 F.3d 376, 378 (6th Cir. 1993). This burden may be satisfied, however, by the movant "pointing out to the court that the [non-moving party], having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case." *Barnhart v. Pickrel, Schaeffer & Ebeling Co., L.P.A.*, 12 F.3d 1382, 1389 (6th Cir. 1993).

Faced with such a motion, the opposing party must submit evidence in support of any material element of the claim or defense at issue in the motion on which it would bear the burden of proof at trial. *Celotex*, 477 U.S. at 331–32. As "the requirement [of the Rule] is that there be no *genuine* issue of *material* fact," the Supreme Court has made clear that "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (emphasis in original). Ancillary factual disputes, those "that are irrelevant or unnecessary[,] will not be counted." *Id.* Furthermore, "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Id.* at 252. Instead, the opposing party must present "significant probative evidence" demonstrating that "there is [more than] some metaphysical doubt as to the material facts" to survive summary judgment and proceed to trial on the merits. *Moore v. Philip Morris Companies, Inc.*, 8 F.3d 335, 339–40 (6th Cir. 1993) (applying *Anderson*, 477 U.S. at 249–50; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

At this summary judgment stage, it is not the Court's role "to weigh the evidence and determine the truth of the matter but [rather] to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. In so doing, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157–59 (1970) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962))). Adherence to this standard, however, does not permit the Court to assess the credibility of witnesses. *See Adams v. Metiva*, 31 F.3d 375, 378 (6th Cir. 1994) (citing *Anderson*, 477 U.S. at 255)).

5

### III. ANALYSIS

Defendants contend that all three of Plaintiff's claims lack support both in fact and law. The Court agrees.

### A. Statutory claims under Title II and its Ohio counterpart

### 1. Title II

Title II of the Civil Rights Act of 1964 reads as follows:

> All persons shall be entitled to the full and equal enjoyment of the **goods, services, facilities, privileges, advantages, and accommodations** of any place of public accommodation,[2] as defined in this section, **without discrimination** or segregation **on the ground of** race,[3] color, **religion** or national origin.

42 U.S.C. § 2000a(a) (emphasis added). Neither party has cited to a Sixth Circuit case that expressly sets forth the elements necessary to establish a Title II claim. But both accede, as does the Court, that a Title VII-inspired evaluation is appropriate. Thus, a plaintiff may establish his case either by presenting direct evidence of discrimination or, alternatively, by establishing a *prima facie* case with circumstantial evidence under the burden-shifting analysis articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Bormuth v. The Dahlem Conservancy*, 837 F. Supp. 2d 667, 674 (E.D. Mich. 2011) (applying *McDonnell Douglas* to claim of religious discrimination under § 2000a). Plaintiff presents no direct evidence of discrimination. To proceed, then, he must establish the four well-known elements of the *McDonnell Douglas* test. *See id.* Specifically, Plaintiff must show that: (1) he is a member of a

---

[2] In their Memorandum in Support, Defendants note—without citation to any authority—that there is a "legitimate dispute" about whether the Oakley club falls within the statute's definition of "place of public accommodation," but do not formally argue the issue. (*See* Doc. 44 at PageID 677 n.3.) Thus, for purposes of ruling on the instant motion, the Court will assume without deciding that this LA Fitness site is subject to Title II's mandate.

[3] The Second Amended Complaint alleges discrimination on the ground of race as well as religion. (*See* Doc. 33 at ¶ 105 (at PageID 197).) The Court observes, however, that in his Memorandum in Opposition, Plaintiff quotes the statute in excerpt, and includes only "religion" as a prohibited ground of discrimination. (*See* Doc. 49 at PageID 898.) This focus is consistent with the evidence cited for and against summary judgment, which concentrates almost exclusively on Plaintiff's status as a Muslim. Accordingly, the Court presumes that Plaintiff has abandoned any claim of discrimination based on race.

protected class; (2) he attempted to exercise the right to full benefits and enjoyment of the Oakley club; (3) he was denied those benefits and enjoyment; and (4) he was treated less favorably than similarly situated persons who are not members of the protected class. *Id.*

Relying on Sixth Circuit precedent concerning the test for claims under 42 U.S.C. § 1981[4] in the *commercial* (versus employment) setting, Plaintiff urges that the fourth element be expanded to include an alternate scenario. In *Christian v. Wal-Mart Stores, Inc.*, two female shoppers, one black (Lois Christian) and one white (Amber Edens), sued Wal-Mart, claiming that they were refused their right to make a contract with the retailer because of Christian's race. 252 F.3d 862 (6th Cir. 2001). Both were asked by local police to leave the store before completing their Christmas toy purchases, largely because a floor employee mistakenly suspected Christian of shoplifting. Noting that "[t]here is ample precedent for requiring a distinct formulation of the burden-shifting framework in differing factual circumstances[,]" the Sixth Circuit observed:

> [E]mployment decisions are "regularized and periodic, are made by supervisory personnel, and by their very nature are almost always documented. . . . [They] leave behind a paper trail of evidence which to a greater or lesser extent will be available during discovery or otherwise to a discrimination victim." Therefore, in the employment context it makes

---

[4] 42 U.S.C. § 1981 reads as follows:

(a) Statement of equal rights
All persons within the jurisdiction of the United States shall have the same right in every State and Territory **to make and enforce contracts**, . . .

(b) "Make and enforce contracts" defined
For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

(c) Protection against impairment
**The rights protected by this section are protected against impairment by nongovernmental discrimination** and impairment under color of State law.

(Emphasis added.)

> sense to insist upon evidence of "similarly situated applicants or employees." **In the commercial establishment context, on the other hand, the clientele is "largely itinerant," and the task of producing similarly situated persons outside the protected group is much more difficult.**

*Id.* at 870–71 (citations omitted) (emphasis added).  Accordingly, in a § 1981 case involving a commercial establishment, a plaintiff must show that: (1) he is a member of a protected class; (2) he sought to make or enforce a contract for services ordinarily provided by the defendant; and (3*) he was denied the right to enter into or enjoy the benefits of the contractual relationship in that* (a) he was deprived of services while similarly situated persons outside the protected class were not and/or (b) *he received services in a markedly hostile manner that a reasonable person would find objectively discriminatory.  Id.* at 872; *Wheat v. Chase Bank, JP Morgan Chase Bank, N.A.*, No. 3:11-cv-309, 2014 WL 457588, at *12–13, 17–18 (S.D. Ohio Feb. 3, 2014) (Rice, J.); *Thompson v. JP Morgan Chase Custody Servs. Inc.*, No. 09-127-JBC, 2011 WL 1226496, at *2–3 (E.D. Ky. Mar. 29, 2011).  In light of *Christian*, then, Plaintiff contends that such an adaptation of the *McDonnell Douglas* elements is appropriate here with regard to his Title II claim.  The Court concurs, and so we proceed.

Defendants do not contest that Plaintiff, as a practicing Muslim, is a member of a protected class.  They argue, however, that Mr. Fall has not been prohibited or restricted from using or enjoying *any* of the Oakley club's services, facilities, privileges, advantages, and accommodations.  Hence Plaintiff cannot establish the necessary second and third elements of a *prima face* case of discrimination, and, therefore, Defendants maintain they are entitled to judgment as a matter of law.

During his deposition, Mr. Fall could not identify any occasion when he was denied entrance to the Oakley club or, once inside, the use of any of the facilities within.  (*See* Fall Dep.,

8

Doc. 38 at 65:9–66:12.) On this record, the analysis seemingly should end with a ruling in Defendants' favor. Plaintiff's theory of the case, however, is slightly more nuanced. Although Title II prohibits religious discrimination in places of public accommodation, Plaintiff concedes that it does not guarantee him the right to practice his Muslim faith at LA Fitness, or, by extension, to compel LA Fitness to set aside a space of his choosing to allow him to conduct Salat. Yet Title II *would* be violated if LA Fitness permitted people of other faiths to pray in that space but refused him the same privilege. Plaintiff's premise is sound, but lacking in factual support.

Plaintiff testified that he had not seen anyone else pray in the corner location of the men's locker room prior to January 29, 2015. (*Id.* at 49:20–50:5.) Nor had he seen anyone sit, stretch, stand, or listen to music there prior to that date. (*Id.* at 50:6-14.) Not before, and not after. (*Id.* at 50:19–51:16.) Without a doubt, this testimony undermines any suggestion that non-Muslim Oakley club members were allowed to pray in the corner location of the men's locker room. As to the other portions of the locker room, Plaintiff testified that he had seen people "doing the cross sign" in front of their lockers, but he could not remember their names. (*Id.* at 96:2-24.) He also had seen some individuals sitting on the locker room benches and "doing meditate." (*Id.* at 97:23–98:16.) Their meditation, however, did not make it more difficult to access one's locker, retrieve one's coat from the coat rack, or approach the exit. (*Id.* at 99:2-10.) And it did not involve any standing and kneeling, part of the Salat ritual in which Mr. Fall engages.

The Court concludes that Plaintiff has not shown that he has been treated differently— vis-à-vis the enjoyment of prayer after exercise—than similarly situated Oakley club members who do not share his Muslim faith. The Court also concludes that Plaintiff has not shown that he was treated in a markedly hostile manner that a reasonable person would find objectively

9

discriminatory. Crediting the harshest rendition of "who said what" on January 29, 2015, there can be no dispute that Plaintiff since has been offered *multiple* alternate locations[5] in which to pray. (*See id.* at 66:13–68:4 & Defendants' Dep. Exh. 6[6] (at PageID 370).) And, in fact, Plaintiff has prayed numerous times in the fire exit hallway,[7] although he prefers it less to the corner of the locker room. (*Id.* at 60:2-20.) However, he has chosen not to pray in the Kids Klub, racquetball courts, the yoga/exercise/spinning rooms, or the upstairs mezzanine level. (*Id.* at 60:21–61:9.)

Subsequent to the January 29 incident, Plaintiff has visited the Oakley club regularly: 27 days during February 2015; 26 days during March 2015; 27 days during April 2015; 29 days during May 2015; 27 days during June 2015; 25 days during July 2015; 29 days during August 2015; 26 days during September 2015; and 10 days during the first 14 days of October 2015.[8] He has prayed "pretty much every time" he has visited, as it is "part of [his] procedure – [his] ritual." (*Id.* at 73:18-19.) This consistent and steady attendance record belies any suggestion of hostility, as actually perceived by Plaintiff or as gauged by what a reasonable person would find objectively discriminatory.

In their briefing, Plaintiff's counsel devote considerable attention to the disagreement between Defendant Thomas—a janitor at LA Fitness--and Mr. Fall concerning the tenets of

---

[5] These locations originally were identified to the Court on March 4, 2015 during the facility tour. Defense counsel represents that one of the options, "the area between the sales staff's desks and the racquetball courts, and behind the built-in counter" is no longer available because it recently has been built out "to serve healthy snacks and drinks." (*See* Reply in Support, Doc. 51 at PageID 954 n.2.) Regardless, when it was available, Plaintiff declined to use the area to pray.

[6] This deposition exhibit was admitted at oral argument and is attached to this Order. It illustrates, in yellow highlighter, the alternate locations for prayer suggested to Mr. Fall.

[7] At oral argument, counsel called the Court's attention to ¶ 21 of Defendants' Proposed Undisputed Facts (Doc. 44-1 at PageID 688), to which Plaintiff admitted (Doc. 49-2 at PageID 916). The date contained within should read March 4, 201**5** instead of March 4, 2013. The Court presumed as much when reviewing the pleading in advance of oral argument, but appreciates counsel's courtesy in clarifying this typographical error.

[8] The instant motion was filed on October 19, 2015. At oral argument, defense counsel represented that Mr. Fall has continued to visit the Oakley club in the ensuing months with the same frequency.

Islamic law and the proper way to conduct Salat.[9] (*See* Memorandum in Opposition, Doc. 49 at PageID 894–895.) At oral argument, counsel referred to Defendant Thomas as the "ringleader" at the heart of the January 29 incident. Indeed, based on his deposition testimony, they portray his attitude toward Plaintiff as one corrupted by acrimony. Whether and to what extent rancor exists between them, however, is not an issue of *material* fact. The facts that *are* material—regarding Plaintiff's unfettered use of the Oakley club's facilities since January 29, 2015—are *not* in dispute.

2. **Ohio Rev. Code § 4112.02(G)**

The Ohio counterpart to Title II reads as follows:

It shall be an unlawful discriminatory practice:

. . .

(G) For any proprietor or any employee, keeper, or manager of a place of public accommodation to deny to any person, **except for reasons applicable alike to all persons regardless of** race, color, **religion**, sex, military status, national origin, disability, age, or ancestry, **the full enjoyment of the accommodations, advantages, facilities, or privileges of the place of public accommodation.**

Ohio Rev. Code § 4112.02(G) (emphasis added). It is also unlawful to discriminate against a person who has opposed public accommodation discrimination or who has "made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing" regarding same. *Id.* § 4112.02(I). Additionally, it is unlawful "[f]or any person to aid[ or] abet . . . or to attempt directly or indirectly to commit" public accommodation discrimination. *Id.* § 4112.02(J).

---

[9] Defendant Thomas works full-time as "chief maintenance man" at an apartment building located in the College Hill neighborhood of Cincinnati. He assumed his part-time position as a janitor at the Oakley club in September 2014. (Thomas Dep., Doc. 48 at 8:24–9:20 (at PageID 799–800).) He testified that he has been a practicing Muslim for 36 years. (*Id.* at 22:7 (at PageID 813).)

In *Ohio Civil Rights Comm'n v. Lysyj*, the Ohio Supreme Court considered whether a white tenant, renting space in a trailer park, was the victim of public accommodation discrimination when she was asked to leave after a visit from a black male. 38 Ohio St. 2d 217, 313 N.E.2d 3 (1974). At issue before the court was whether a "trailer park" fell within the definition of a place of public accommodation within the meaning of Ohio Rev. Code § 4112.01, *id.* at 220–21, 313 N.E.2d at 6, and whether the Ohio Civil Rights Commission "had the power to compel the trailer park owner to pay his former tenant compensatory and punitive damages, *id.* at 222, 313 N.E.2d at 7. The court answered the first question presented in the affirmative, and the second in the negative. In response to the owner's argument that § 4112.02(G) did not apply to "indirect discrimination against a person on the basis of the race or color of his associates[,]" the court observed as follows:

> When determining whether there has been unlawful discrimination under R.C. 4112.02(G), **the test is simply whether the** proprietor, keeper, **manager** or employee **of a place of public accommodation has denied to any person the full enjoyment of such place** for reasons not applicable alike to all persons, **irrespective of race**, color, religion, national origin or ancestry.

*Id.* at 221, 313 N.E.2d at 6 (emphasis added). Plaintiff's counsel rely on this very broad "interpretation" by the *Lysyj* court of § 4112.02(G) for the proposition that Mr. Fall should have been allowed to conduct Salat in the corner location of the men's locker room.

The Court is mindful that it is obliged to construe §4112.02(G) liberally "for the accomplishment of its purposes[.]" Ohio Rev. Code § 4112.08. But it is an exaggeration to say that *Lysyj* truly *analyzed* the meaning of the phrase "full enjoyment of the accommodations, advantages, facilities, or privileges" of a place of public accommodation and concluded that it has no limitation whatsoever. Rather, the court's focus was on the issue of race:

12

> In the case at bar, the record establishes that [the owner] denied [his former tenant] the full enjoyment of the facilities of his trailer **park because she was white and was entertaining someone who was black**. A principal motivation for [the owner's] action was [his former tenant's] race, and his conduct constituted unlawful discrimination within the meaning of R.C. 4112.02(G).

38 Ohio St. 2d at 221, 313 N.E. 2d at 6 (emphasis added).

Unlike the Ohio Supreme Court, however, the First District Court of Appeals (Hamilton County) has engaged in a purposeful review of the language in *Meyers v. Hot Bagels Factory, Inc.*, 131 Ohio App. 3d 82, 721 N.E. 2d 1068 (1999). "Full enjoyment" of a place of public accommodation means "the right to purchase all services or products of a place of public accommodation, the right to be admitted to any place of public accommodation, and the right to have access to the services and products of such a place in the same manner as all other customers." *Id.* at 104, 721 N.E. 2d at 1083.

Review of the undisputed evidence makes clear that § 4112.02(G) has not been violated. Plaintiff obviously was permitted to purchase a membership to the Oakley club, and he has never been denied admission thereto. Further, for every day he has chosen to visit, he has had access to the same services as any other member. And, as the club's attendance records reflect, Plaintiff makes full use of his membership. Even if "full enjoyment" included prayer, as Plaintiff argues that *Lysyj* would dictate, there is no support for counsel's contention that other members were permitted to pray in the corner location of the men's locker room. Thus, neither Title II, nor its Ohio counterpart codified at § 4112.02(G), require LA Fitness to allow Mr. Fall to pray in the location he prefers.

### B. Common law claim of negligence

Under Ohio law, a plaintiff asserting a claim of negligent supervision must demonstrate: (1) an employment relationship; (2) the employee's incompetence; (3) the employer's actual or

13

constructive knowledge of that incompetence; (4) the employee's act or omission causing the plaintiff's injury; and (5) a causal link between the employer's negligence in supervising the employee and the plaintiff's injury. *Alleman v. YRC,* 787 F. Supp. 2d 679, 683 (N.D. Ohio 2011) (citing *Lehrner v. Safeco Ins./Am. States Ins. Co.*, 171 Ohio App. 3d 570, 2007-Ohio-795, 872 N.E.2d 295, at ¶ 41). An "'**underlying requirement** in actions for negligent supervision and negligent training is that **the employee is individually liable for** a tort or guilty of **a claimed wrong against a third person**, who then seeks recovery against the employer.'" *Nat'l Union Fire Ins. v. Wuerth*, 122 Ohio St. 3d 594, 2009-Ohio-3601, 913 N.E.2d 939, at ¶ 23 (quoting *Strock v. Pressnell*, 38 Ohio St. 3d 207, 217, 527 N.E.2d 1235, 1244 (1988)) (emphasis added).

Defendants do not contest the fact of an employment relationship between corporate Defendant Fitness International and individual Defendants Thomas, Kemker,[10] O'Reilly, and Bayer.[11] (*See* Doc. 44 at PageID 683.) But they argue that, in the absence of proof of any underlying wrongful conduct, none of the other elements can be satisfied.

Defendants are correct. Because, as a matter of law, Plaintiff has not suffered a deprivation under Title II or its Ohio counterpart, there can be no showing of "incompetence," or, in turn, "knowledge of incompetence." And, without a cognizable injury, the issue of causation becomes moot. Accordingly, Defendants are entitled to judgment as a matter of law with respect to Plaintiff's common law claim of negligence.

---

[10] Defense counsel represents that Zach Kemker is no longer employed by Fitness International. (*See* Reply in Support, Doc. 51 at PageID 955.)

[11] Eric Bayer was transferred from the Oakley club to the LA Fitness location in West Chester, Ohio on May 30, 2015, in what he described as a "lateral" move. (Bayer dep., Doc. 43 at 10:11–11:14 (PageID 632).) Defense counsel represents that Defendant Bayer has since returned to the Oakley club as General Manager. (*See* Reply in Support, Doc. 51 at PageID 955.)

## IV. CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment (Doc. 44) is **GRANTED.**

**IT IS SO ORDERED**.

Dated: 2/11/16          S/Susan J. Dlott
                                   Judge Susan J. Dlott
                                   United States District Court